UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COOKEVILLE DIVISION

| | |
|---|---|
| LISA K. BANDY, )<br>Plaintiff, )<br>)<br>v. )<br>)<br>MICHAEL ASTRUE, )<br>Commissioner of Social Security, )<br>Defendant. ) | Civil Action No. 2:10-cv-00119<br>Judge Nixon/Brown |

To: The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Disability Insurance Benefits (DIB), as provided under Title II of the Social Security Act (the "Act"), as amended. Currently pending before the Magistrate Judge is Plaintiff's Motion for Judgment on the Record. (Docket Entries 12, 13). Defendant has filed a Response, and Plaintiff has filed a Reply. (Docket Entries 14, 15). The Magistrate Judge has also reviewed the administrative record (hereinafter "Tr."). (Docket Entry 10). For the reasons set forth below, the Magistrate Judge **RECOMMENDS** the Plaintiff's Motion be **DENIED** and this action be **DISMISSED**.

### I. INTRODUCTION

Plaintiff filed the pending application for DIB on October 23, 2007, alleging she was disabled as of October 1, 2001 as a result of scoliosis, thyroid problems, Grave's disease, and mental impairments. (Tr. 150-52). Plaintiff's claim was denied initially and upon reconsideration. (Tr. 94-96, 100-01). Plaintiff requested a hearing before an ALJ, which was held on June 25,

2009, before ALJ Donald Garrison (Tr. 36-52). At the hearing, Plaintiff amended her onset date to September 24, 2005. (Tr. 39). Plaintiff requested and was granted a supplemental hearing, which was held on October 27, 2009. (Tr. 25-34). On January 1, 2010 the ALJ issued an unfavorable decision. (Tr. 54-65).

In his decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2006.

2. The claimant did not engage in substantial gainful activity during the period from her amended onset date of September 24, 2005 through her date last insured of December 31, 2006 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: lumbar and thoracic degenerative disc disease and spondylosis; mechanical low back pain syndrome; and fibromyalgia (20 CFR 404.1520(c)).

4. Through the date last insured the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) that is limited to occasional postural limitations, such as climbing, balancing, stooping, crouching, kneeling and crawling; occasional pushing and pulling with the arms; avoiding exposure to concentrated temperature extremes; and having a sit/stand option at will.

6. Through the date last insured, the claimant was unable to perform any past relevant work. (20 CFR 404.1565).

7. The claimant was born on October 20, 1964 and was 42 years old, which is defined as a younger individual age 18-44, on the date last insured (20 CFR 404.1563).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability

> because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from September 24, 2005, the amended onset date, through December 31, 2006, the date last insured (20 CFR 404.1520(g)).

(Tr. 54-65).

The Appeals Council denied Plaintiff's request for review on October 29, 2010. (Tr. 1-3). This action was timely filed on December 2, 2010. (Docket Entry 1).

## II. REVIEW OF THE RECORD

Plaintiff previously filed an application for DIB, which was denied on September 23, 2005. (Tr. 73-81). This decision became final when the Appeals Council denied Plaintiff's request for review. (Tr. 87-89). Plaintiff then amended her onset date in this application to September 24, 2005. (Tr. 39). The ALJ determined Plaintiff's date last insured ("DLI") was December 31, 2006. (Tr. 57, 157).

Plaintiff has been treated by her primary care physician, Dr. Roger McKinney, since 2000. (Tr. 408-52). On October 13, 2000, Plaintiff was noted as having hypothyroidism and scoliosis. (Tr. 452). At an October 4, 2001 visit, the provider noted carpal tunnel syndrome in Plaintiff's right wrist. (Tr. 451). Plaintiff also sought treatment for anxiety, stress headaches, and other issues. (Tr. 408-52).

Plaintiff first sought treatment for progressive lower back pain on February 20, 2002, when she was referred to Dr. Michael P. Moore at Tennessee Sports Medicine and Orthopaedics.

(Tr. 360). Dr. Moore ordered an MRI, which he later described as "unremarkable." (Tr. 358, 365). He continued her Vioxx prescription and recommended physical therapy. *Id.* On April 9, 2002, he noted Plaintiff had some improvement on Vioxx and had moderate impaired trunk stabilizer endurance. (Tr. 357). He restricted her to light/medium functional limitations, lifting up to 25 pounds intermittently with no repetitive lifting. *Id*.

Plaintiff was treated with physical therapy at Comprehensive Rehabilitation, Inc., from February to July 2002. (Tr. 239-67). In June 2002, Plaintiff noted she had a decrease in pain since starting physical therapy, down to 2 out of 10. (Tr. 241). On July 17, 2002, Plaintiff was discharged from therapy. (Tr. 239). Her therapist noted Plaintiff had plateaued that month, and her family problems interfered with therapy. *Id*.

From February 19, 2004 until April 9, 2006, Plaintiff obtained psychiatric treatment at Volunteer Behavioral Health Care System. (Tr. 268-329). Her Global Assessment of Functioning ("GAF") scores ranged from 45 to 65. (Tr. 269). Plaintiff was diagnosed with generalized anxiety disorder and major depressive disorder, recurrent, moderate. *Id*. Plaintiff's therapist recommended outpatient counseling one to two times per month. (Tr. 271). At her intake assessment, Plaintiff noted she had poor sleep, concentration, and impulse control, with anxiety in public and mood swings. (Tr. 288). Plaintiff repeatedly complained about her financial problems. (Tr. 292, 297, 299, 301, 303, 312, 318, 320). Plaintiff also complained about family issues. (Tr. 311, 312, 319). She did see some improvement on medication. (Tr. 305, 307).

On April 27, 2005, Dr. Moore noted an MRI of Plaintiff's lumbar spine did not show any significant disk herniation. (Tr. 351, 509). At a June 14, 2006 follow-up, Dr. Moore stated Plaintiff had not been optimally compliant with her back exercises. (Tr. 348). Plaintiff's pain

4

apparently improved on Mobic. (Tr. 346). On July 20, 2006, Dr. Moore discussed the possibility of trying an epidural steroid injection, but Plaintiff deferred. (Tr. 343).

Dr. McKinney submitted a Medical Opinion Re: Ability to Do Work-Related Activities dated May 24, 2005. (Tr. 422-23). He believed Plaintiff should be limited to carrying 10 pounds on an occasional or frequent basis, could stand and walk approximately 4 hours in an 8-hour workday, and could sit approximately 4 hours in an 8-hour workday. (Tr. 422). She would need to change positions approximately every half hour and would need to lie down approximately one to two times per workday. *Id*. Plaintiff could, in Dr. McKinney's opinion, twist, stoop, crouch, and climb stairs very occasionally, but she could never climb ladders. (Tr. 423). Plaintiff's ability to push and pull is also impacted by her impairment. *Id*. Plaintiff was also to avoid even moderate exposure to extreme heat and to avoid concentrated exposure to extreme cold and high humidity. *Id*. Dr. McKinney believed Plaintiff would be absent from work more than four days per month. *Id*.

Dr. Moore completed his a Medical Opinion Re: Ability to Do Work-Related Activities dated July 9, 2006. (Tr. 330-31).[1] He believed Plaintiff could occasionally lift 20 pounds, frequently lift less than 10 pounds, could stand for 3 hours in an 8-hour day and sit for 6 hours in an 8-hour day. (Tr. 330). Plaintiff would need to change position every 30-45 minutes and walk around approximately once every 45 minutes. *Id*. She would need to lie down twice per shift. *Id*. Dr. Moore noted these restrictions were a result of Plaintiff's chronic low back pain, lumbar spondylosis, and left sciatica. *Id*. In Dr. Moore's opinion, Plaintiff could occasionally twist,

---

[1] Dr. Moore completed a prior Medical Opinion dated May 24, 2005 that was less restrictive than his July 9, 2006 opinion. (Tr. 332-33). In that opinion, he noted Plaintiff had poor core trunk strength and endurance. (Tr. 332).

5

stoop, crouch, and climb stairs, but she could never climb ladders. (Tr. 331). He limited her exposure to extreme cold and high humidity. *Id*. Dr. Moore also believed Plaintiff would be absent more than four days per month. *Id*.

Plaintiff began physical therapy again at Macon County General Rehab on August 23, 2006. (Tr. 502-07). She apparently attended for four visits and then stopped going after September 11, 2006. (Tr. 504-05).

Andrew J. Phay, Ph.D., submitted a Psychiatric Review Technique form dated November 24, 2007. (Tr. 372-85). Dr. Phay believed Plaintiff's impairments were not severe. (Tr. 372). He noted that, at the time, she was not receiving outpatient treatment or medication for her psychiatric problems. (Tr. 384). She was able to care for her own hygiene and prepare simple meals, as well as performing some light household chores. *Id*. She was able to drive alone and shop. *Id*.

Plaintiff first saw Dr. Jeffrey Hazlewood on December 11, 2007. (Tr. 498-501). Dr. Hazlewood recommended Plaintiff continue narcotics and other conservative management, as she could not afford much other treatment. (Tr. 496). He believed an epidural might help, but she could not afford it. *Id*. On February 1, 2008, Dr. Hazlewood encouraged Plaintiff to exercise at home. (Tr. 494). He also noted an MRI showed minimal degenerative changes with a disc protrusion at T11-12. *Id*.

Dr. McKinney submitted a Medical Source Statement dated March 21, 2008. (Tr. 400-06). Dr. McKinney opined that Plaintiff could lift up to 20 pounds occasionally, with no repetitive lifting, and carry up to 20 pounds occasionally, with no repetitive carrying. (Tr. 400). He based these restrictions on chronic mechanical back pain that has been getting progressively

worse. *Id*. He believed Plaintiff could sit for twenty minutes, stand for thirty minutes, and walk for thirty minutes at one time. (Tr. 401). Plaintiff could sit for 3 hours in an 8-hour work day, stand for 3 hours in an 8-hour workday, and walk for 2 hours in an 8-hour workday. *Id*. Plaintiff could occasionally reach, could frequently handle, finger, or feel, and could never push or pull. (Tr. 402). There was no difference in Plaintiff's ability to do any of these actions with either hand. *Id*. Plaintiff could also operate foot controls occasionally, but she could not use them repetitively due to chronic back pain. *Id*. Dr. McKinney believed Plaintiff could occasionally climb stairs, rams, ladders, and scaffolds and could occasionally balance, but she could never stoop, kneel, crouch, or crawl. (Tr. 403). Dr. McKinney further noted Plaintiff could never tolerate exposure to unprotected heights but could occasionally tolerate exposure to moving mechanic parts, operating a motor vehicle, humidity and wetness, pulmonary irritants, extreme cold, extreme heat, and vibrations. (Tr. 404).

On April 25, 2008, Plaintiff saw Dr. Hazlewood. He noted Plaintiff had questionable fibromyalgia, but she did meet the criteria based on more than 11 of 18 fibromyalgia tender points. (Tr. 492).

On August 7, 2008, a note was made in Dr. Hazlewood's file that Plaintiff had asked if Dr. Hazlewood would complete a disability form on her behalf, and Plaintiff was advised he would not. (Tr. 493). One day later, an additional note was made that Dr. Hazlewood advised Plaintiff's husband that he could not support disability and would not fill out a Social Security disability form. *Id*.

Plaintiff saw Dr. Hazlewood again on October 8, 2008. (Tr. 489-90). He noted that her case was difficult, and they would possibly need to consider a surgical referral if she did not

7

improve. (Tr. 490). Plaintiff told Dr. Hazlewood that she was unable to afford a TENS unit, but she soaked in a hot tub, which helped her back pain. (Tr. 489). She also stated she did not want to have any epidural steroid injections because a friend told her bad stories about them. *Id*. On January 23, 2009, Dr. Hazlewood administered an SI joint injection. (Tr. 487). At a follow-up appointment on April 22, 2009, Plaintiff reported using a tanning bed to help with her pain. (Tr. 511).

An MRI dated April 29, 2009 showed mild bulges at T11-T12 and L1-L2, but no evidence of cord or nerve root displacement and no significant foraminal narrowing. (Tr. 522-23). A lumbar spine x-ray on the same date showed no acute bony abnormality and no evidence of instability on flexion or extension. (Tr. 524).

Dr. McKinney submitted another Medical Source Statement dated June 2, 2009. (Tr. 514-20). The restrictions are identical to his March 21, 2008 opinion. (Tr. 400-06).

At her first hearing, Plaintiff testified that she has an eighth-grade education and is able to read and write. (Tr. 40). She lives with her husband and has not worked since her alleged onset date, September 24, 2005. (Tr. 41). Plaintiff's last job ended when the plant closed in 2001, but she had already intended to quit due to her alleged disability prior to the closing. (Tr. 47). She is unable to work due to her nerves, depression, back pain, and fibromyalgia. (Tr. 41). Dr. McKinney is her primary care physician, and Dr. Hazlewood is her pain management specialist. *Id*. She saw Dr. Moore as her pain management specialist in the past. *Id*. Dr. Moore discontinued treatment because she owed money to his office. (Tr. 44).

She is no longer able to receive care at Valley Ridge Mental Health, because she cannot afford it on her husband's insurance. (Tr. 41-42). She continues to take medication for her mental

problems, prescribed by Dr. McKinney. (Tr. 42). Plaintiff testified that the medication does not help her and sometimes causes nausea and makes her light-headed. *Id*. She gets nervous and upset because she knows she cannot help pay their bills and fears they will lose their home. *Id*.

Plaintiff has constant back pain at about a 7 or 8 out of 10 and takes prescription pain medication, which helps her "about half and half." (Tr. 42-43). The medication "wires" her. (Tr. 43). Plaintiff has not had surgery for her back pain. *Id*. Plaintiff's pain is relieved by a TENS unit, but she cannot afford it. *Id*. She uses hot towels, which are helpful. *Id*. She has a hard time with cold temperatures. (Tr. 44). Plaintiff had a course of physical therapy, and the therapist recommended the TENS unit, but Plaintiff stopped going because she could not afford it. (Tr. 44). Activities make her back pain worse, so she spends much of her time resting and laying around. (Tr. 43). She also moves around and changes positions frequently. (Tr. 44). Plaintiff stated her pain has increased since her previous application. (Tr. 43).

Plaintiff is able to dress herself, prepare microwave meals, make the bed, and occasionally dust or do dishes. (Tr. 45). She can stand for approximately 10-15 minutes before needing to sit. *Id*. She can sit for approximately the same amount of time before needing to change positions. *Id*.

Plaintiff complained of problems with her right hand, but she was tested for carpal tunnel "a long time ago," and the test was negative. (Tr. 45-46). She stated she has been having more problems recently, but Dr. Hazlewood decided he would concentrate on her pain management rather than her wrist symptoms, at this time. (Tr. 46).

Plaintiff has thyroid problems, in the form of Graves disease. She does not take medication for it. (Tr. 46). Plaintiff takes Lortab or Hydrocodone for pain. *Id*. Dr. Hazlewood

9

diagnosed her with fibromyalgia. (Tr. 48). Plaintiff testified that her physician limited her to lifting less than 10 pounds and that she needed to lie down two to three times per day. *Id*.

Vocational Expert ("VE") Gail Ditmore identified Plaintiff's previous work as machine operator, medium, semiskilled and clothing presser, medium, semiskilled. (Tr. 39-40). The ALJ asked her to assume a person with claimant's age, education, and work experience who could perform light work with occasional postural activities, no concentrated temperature extremes, and a sit/stand option. (Tr. 48). The VE testified that such a person could not perform Plaintiff's past work but could work as a machine tender or production worker at the light level. (Tr. 48-49). She could also perform work as a sedentary production worker or inspector. (Tr. 49). The ALJ asked if any of these jobs would require overhead reaching, and the VE stated they would not. *Id*. If the hypothetical person could not reach in front of herself, however, the jobs would no longer be available. *Id*.

The ALJ asked whether Dr. McKinney's medical assessment would allow work. (Tr. 50). The VE testified there would be no work, as Plaintiff could never stoop. *Id*. The ALJ then asked whether Dr. Moore's medical assessment would allow work. *Id*. Similarly, the VE testified that Dr. Moore's assessment would not allow work, as Plaintiff has to lie down twice a day and be absent four times per month. *Id*. In addition, if the ALJ found Plaintiff's testimony fully credible, no work would be available. (Tr. 51).

On July 31, 2009, at the ALJ's request, Dr. Donita Keown examined Plaintiff. (Tr. 559-68). Dr. Keown reviewed Plaintiff's April 29, 2009 MRI and her list of medications. (Tr. 559). Dr. Keown stated Plaintiff moved "normally through the clinic upon arrival" but, once in the examining room, "ambulat[ed] in a different manner, communicating pain." (Tr. 560). Dr.

10

Keown believed Plaintiff was not providing a reliable effort. *Id*. Based on her examination, she believed Plaintiff had no need for a restricted work environment. (Tr. 561-68).

At Plaintiff's second hearing, held on October 27, 2009, she testified that, since the last hearing, she had been having chest pains due to stress. (Tr. 28). A specialist performed an EKG, which was negative. *Id*. The doctor also ordered a stress test, but Plaintiff had not had one at the time of the hearing due to her inability to afford the test. (Tr. 28-29).

Plaintiff further testified that she did not feel that the consultative examiner, who conducted an exam at the ALJ's request following the prior hearing, had treated her fairly. (Tr. 29). She stated the examiner did not ask her anything and did only a few tests. *Id*. Plaintiff was in the room for approximately 15 minutes, some of which was waiting on the doctor to arrive. *Id*. Plaintiff was asked to bend forward and back and side to side. *Id*.

Plaintiff stated she is unable to do all of her housework and only does a few odds and ends. (Tr. 30). She has problems sleeping, because she tosses and turns a lot. *Id*. She estimated she could lift about five pounds without pain. (Tr. 31).

Dr. Hazlewood and Dr. Mueller recommended Plaintiff get a steroid shot in her spine, but Plaintiff did not get it because they could not guarantee it would help. *Id*. She could not afford the TENS unit, which she has used with success in the past. *Id*. Plaintiff also uses a tanning bed to help with her pain. (Tr. 32).

Plaintiff testified her nerves and mental problems were getting worse. (Tr. 32). She stopped going to Valley Ridge for mental health treatment because of the expense and because she did not like her new provider because he gave her homework. (Tr. 33).

In a record submitted after the hearing, Dr. Hazlewood stated he would "write restrictions

11

of no pushing, pulling, or lifting greater than 15 lbs. occasionally, no repetitive bending." (Tr. 594).

### III. PLAINTIFF'S STATEMENT OF ERROR AND CONCLUSIONS OF LAW

Plaintiff alleges four errors committed by the ALJ. First, the ALJ erred by not finding Plaintiff's major depressive disorder and anxiety to be a severe impairment. Second, the ALJ erred in giving little weight to the opinion of Dr. McKinney and more weight to the opinion of Dr. Keown.[2] Third, the ALJ erred by giving significant weight to Dr. Moore's restrictions but basing his residual functional capacity decision on only some of Dr. Moore's restrictions. Fourth, the ALJ erred in failing to properly evaluate Plaintiff's allegations of pain.

As an initial matter, review of the ALJ's decision is limited to the time period between September 24, 2005, the date of the previous ALJ decision, and December 31, 2006, Plaintiff's date last insured. The Magistrate Judge has considered the current decision's treatment of Plaintiff's records from Valley Ridge Mental Health after September 2004, however, because it is unclear that the prior decision included these records. (Tr. 76).

A.  Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept

---

[2] Plaintiff's brief identifies the non-treating consultative examiner as "Dr. Doineau," by which the Magistrate Judge assumes she means Dr. Keown.

12

as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a difference conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

B.      Proceedings at the Administrative Level

The Claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

1.  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

2.  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

3.  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[3] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

4.  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in

---

[3] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

> light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.
>
> 5. Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and non-severe. *See* 42 U.S.C. § 423(d)(2)(B).

C. <u>The ALJ Properly Evaluated Plaintiff's Major Depressive Disorder and Anxiety</u>

Plaintiff argues that the ALJ erred by relying solely on the opinion of the non-examining consultant, Dr. Phay, in making his determination regarding the severity of Plaintiff's mental disorders. Plaintiff also complains that the ALJ did not properly consider her GAF scores in making his determination that her mental disorders are not serious.

When a claimant alleges disabling mental impairment, an ALJ is required to evaluate first whether the claimant has a "medically determinable mental impairment" and then to rate the "degree of functional limitation resulting from the impairment." 20 C.F.R. § 404.1520a. The ALJ must evaluate the so-called "A" criteria, consisting of the "symptoms, signs, and laboratory findings" of the claimant's alleged medically determinable mental impairment. *Id.* The ALJ must also evaluate the "B" criteria, which rate the claimant's degree of functional limitation and consist of four functional areas: "[a]ctivities of daily living; social functioning; concentration, persistence,

or pace; and episodes of decompensation." *Id.* The ALJ's application of these criteria must be documented in his decision. *Id.*

As an initial matter, GAF scores are not determinative of disability. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 503 n. 7 (6th Cir. 2006) ("A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning."). Plaintiff's scores ranged from approximately 45 to 65.[4] (Tr. 269). While a GAF score of 45 means the patient has serious symptoms, a GAF score of 65 indicates mild to moderate symptoms.

Here, the ALJ properly considered Plaintiff's allegations of mental problems and had substantial evidence to reject them as severe impairments. The ALJ noted Plaintiff was in the process of being weaned off her only psychological drug, Cymbalta, as of November 2009. (Tr. 60). He noted Dr. Phay's observation that Plaintiff was not limited in activities of daily living, social functioning, and concentration, persistence or pace and that she had no episodes of

---

[4] The Global Assessment of Functioning test is a
subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). A GAF score of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood. A GAF of 41 to 50 means that the patient has serious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning.
*Edwards v. Barnhart*, 383 F.Supp.2d 920, 924 n. 1 (E.D.Mich.2005).

decompensation. (Tr. 60).

Moreover, Plaintiff's records from her mental health providers do not dispute Dr. Phay's opinion. Most of Plaintiff's complaints were about her worry over financial problems. (Tr. 292, 297, 299, 301, 303, 312, 318, 320). Plaintiff saw improvement on medication in 2005, although she testified that her medication provided no relief at her first ALJ hearing. (Tr. 42, 305, 307). Plaintiff's testimony regarding her daily activities is consistent with Dr. Phay's opinion; she is able to microwave meals and do some light household chores. (Tr. 45). She also voluntarily stopped seeing her new provider at Valley Ridge because he gave her homework. (Tr. 33). In short, the ALJ had substantial evidence to conclude Plaintiff's mental impairments are not severe. Plaintiff offered little evidence to the contrary.

D. <u>The ALJ Properly Considered the Opinions of Plaintiff's Treating Physician and the Consultative Examiner</u>

Plaintiff objects to the weight the ALJ gave to the opinion of her primary care physician, Dr. McKinney. The ALJ found Dr. McKinney's opinion to be inconsistent with the opinions of Dr. Moore and Dr. Hazlewood, both treating specialists, and with the opinion of Dr. Keown, the consultative examiner.

An ALJ should give enhanced weight to the findings and opinions of treating physicians since these physicians are the most able to provide a detailed description of a claimant's impairments. 20 C.F.R. § 404.1527(d)(2). Further, even greater weight should be given to a physician's opinions if that physician has treated the claimant extensively or for a long period of time. 20 C.F.R. § 404.1527(d)(2)(i)-(ii). However, if there is contrary medical evidence, the ALJ is not bound by a physician's statement and may also reject it if that statement is not sufficiently supported by medical findings. 20 C.F.R. § 404.1527(d); *Cutlip v. Secretary of H.H.S.*, 25 F.3d

284 (6th Cir. 1994).

While the ALJ is not bound by the opinions of Plaintiff's treating physicians, the ALJ is required to set forth some sufficient basis for rejecting these opinions. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). In discrediting the opinion of a treating source, the ALJ must consider the nature and extent of the treatment relationship, the length of the treatment relationship and the frequency of examinations, the medical evidence supporting the opinion, the consistency of the opinion with the record as a whole, the specialization of the treating source, and any other factors which tend to support or to contradict the opinion. 20 C.F.R. § 404.1527(d)(2); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004).

In this case, the ALJ relied on the opinions of Plaintiff's treating specialists, who opined she could push, pull or lift greater than fifteen pounds, should avoid repetitive bending, should avoid moderate exposure to extreme cold and high humidity, and needed the ability to shift positions at will. (Tr. 63). The ALJ also relied on Dr. Keown's assessment that Plaintiff did not give a reliable effort. *Id*. However, the ALJ chose to rely primarily on the opinions of Dr. Hazlewood and Dr. Moore, and he only gave weight to Dr. Keown's assessment to the extent that it supports a finding that Plaintiff could perform sedentary work. *Id*. It is clear from the record that the ALJ had substantial evidence to discount the opinion of Dr. McKinney. A treating specialist,[5] whose opinion is typically given more weight than non-specialists pursuant to 20 C.F.R. § 404.1527(d)(5), found Plaintiff capable of performing sedentary work.[6] While Dr. McKinney

---

[5] As discussed more fully below, the portion of Dr. Moore's assessment given great weight by the ALJ also supports the ALJ's finding that Plaintiff could perform sedentary work.

[6] Moreover, Dr. Hazlewood apparently told Plaintiff he could not support her claim for disability. (Tr. 493).

17

treated Plaintiff for a wide range of medical problems, her severe impairments, including her back pain and fibromyalgia, were treated by Dr. Hazlewood and Dr. Moore. Therefore, the ALJ properly relied on the opinions of the specialists in determining Plaintiff's RFC.

D.   The ALJ Properly Weighed Dr. Moore's Restrictions

Plaintiff argues the ALJ erred by giving great weight to some of Dr. Moore's restrictions but rejecting others, including his opinion that Plaintiff would have to lie down twice a day and be absent four times per month. (Tr. 330-31, 335). As the Commissioner points out, when the record supports it, an ALJ may accept parts of a physician's opinion and reject other parts. *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 391-92 (6th Cir. 2004). Here, the ALJ noted he was accepting Dr. Moore's restrictions to the extent that "the claimant needed the ability to shift at will and should avoid moderate exposure to extreme cold and high humidity." (Tr. 63).

Dr. Moore completed his medical source statement in July 2006. (Tr. 330-31). Around the same time, Dr. Moore's treatment notes reflect that Plaintiff had not been optimally compliant with her back exercises. (Tr. 348). In addition, Plaintiff's pain had apparently improved on Mobic, and Plaintiff deferred an epidural steroid injection. (Tr. 343, 346). Plaintiff apparently continued to improve under Dr. Moore's care; on September 13, 2006, she indicated her pain averaged a 3-4 with maximal escalation up to a 5-6, and she had experienced a 50-60% improvement in pain control and in overall quality of life. (Tr. 336). The ALJ had substantial evidence for discounting Dr. Moore's opinion to the extent that it was inconsistent with his treatment notes; namely, that Plaintiff would need to be absent from work four or more times per month and would need to lie down one to two times per day.

E.   The ALJ Properly Evaluated Plaintiff's Credibility

18

Plaintiff objects to the ALJ's evaluation of Plaintiff's allegations of pain. An ALJ's finding on the credibility of a claimant is to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing the witness's demeanor and credibility. *Walters v. Commissioner of Social Security*, 127 F.3d 525 (6th Cir. 1997) (citing 42 U.S.C. § 423 and 20 C.F.R. 404.1529(a)). Like any other factual finding, however, an ALJ's adverse credibility finding must be supported by substantial evidence. *Doud v. Commissioner*, 314 F. Supp. 2d 671, 678-79 (E.D. Mich. 2003).

Here, the ALJ discounted Plaintiff's credibility for several reasons, including Plaintiff's effort at her examination by Dr. Keown. (Tr. 62-63). As the ALJ notes, Dr. Keown reported Plaintiff's ambulation was normal when she did not know she was observed but changed to the ambulation of someone in "significant pain" when she was examined. (Tr. 63). In addition, Plaintiff's medical records show little objective evidence of her back pain and fibromyalgia, and Plaintiff improved on medication. (Tr. 62-63). Finally, as noted above, Dr. Hazlewood's records reflect his refusal to support disability and fill out a disability form. (Tr. 493). The Magistrate Judge therefore believes the ALJ had substantial evidence for discounting Plaintiff's credibility.

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge **RECOMMENDS** that Plaintiff's Motion be **DENIED** and this action be **DISMISSED**.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objection to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt

of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004) (en banc).

ENTERED this 28th day of July, 2011.

/S/ Joe B. Brown
_____
JOE B. BROWN
United States Magistrate Judge